Good morning, Your Honors. James Andriola on behalf of the appellant, KBC Bank. I am particularly pleased to appear before you today because unlike my prior three appearances in this case, the District Court has finally done what the Ninth Circuit panels have been doing, which is to conduct an evidentiary hearing to determine whose rights and the subject funds were superior. The evidentiary hearing was conducted by the Honorable Dolly Gee, who had replaced Judge Riehl, who had been the judge the first three times we were here. So Judge Gee conducted the hearing, evidentiary hearing, and after the hearing and extensive briefing of the parties, she issued an order with comprehensive factual findings of fact and conclusions of law, which resolved once and for all for this case that KBC Bank, as a lender, has a superior right to the subject funds over Philips, a judgment creditor. In reaching this conclusion, the District Court established the existence and validity of the subject loan documents. She found that KBC Bank had both an equitable and contractual right of set-off before, during, and after the short-lived 10-business-date TRO period. She recognized that under well-settled law, a bank has a superior right to the funds of its depositor vis-à-vis a third-party judgment creditor, and she rejected Philips' arguments that the TRO somehow extinguished KBC Bank's superior right to the funds. As a result of this finding as to KBC's ultimate superior rights in the funds, the District Court also correctly determined that no matter what the bank did during the 10-day TRO period, Philips had not suffered any damages as a result. The District Court also correctly determined that Philips had failed to properly execute its judgment with respect to the subject funds. It did not issue a writ of attachment or writ of levy on the bank account based in Singapore or the bank account in New York. She also, and as a result of that, she determined that the District Court lacked the authority to require that the contested funds even be deposited into the registry of the court in the U.S. That ruling was based on the Ninth Circuit's decision in the Halal v. Estate of Marcos case. She also determined, there was a dispute, she determined that Philips had failed to extend the TRO so it expired after 10 business days under the applicable federal rules. We think all three of those rulings, the superiority of funds to the bank, the lack of enforcement by Philips, and the lack of damages to Philips, should be affirmed in their entirety. And we don't think anything in the briefing by Philips would prevent this court from affirming in their entirety on those three issues. One particular argument raised by Philips I want to highlight here before turning to the things, the one or two things that we think the District Court got wrong. Philips has repeatedly argued that this court has already determined that KBC was unable to assert its right of set-off in proceedings before the District Court. They make this argument, they say this is an argument, a ruling by implication. I would submit that this court made no such determination by implication or otherwise. Rather this court repeatedly reiterated the need for an evidentiary hearing so the District Court could analyze the respective positions, KBC Banks as a lender with a right of set-off and Philips as a judgment creditor. If Philips was right, we just don't see why the District, why the Ninth Circuit would have even called for a hearing if this court had already ruled in favor of Philips on what was described as a quote-unquote hotly disputed issue. I now want to quickly turn to the aspect of the District Court's ruling that we are asking this court to overturn. When this case was last remanded for the long-awaited hearing, this court stated, and I'm going to read a quote from the Philips 3 opinion, quote, if KBC Banks' rights to the transferred funds are not superior to those of Philips, then retaining those funds violated the TRO, end quote. So in other words, if KBC Banks' rights to the funds are superior to those of Philips, then retaining those funds would not have violated the TRO. Why is that necessarily true? Couldn't both be true? Couldn't both Philips' rights be not superior, or KBC's could be superior, but it still was violating the TRO by receiving funds from KDX and depositing it into its own account? That type of ruling, the GEMCO case, and there's another case in the briefing, Reliance Insurance, in those cases they found that there was the action of applying the funds during the period violated the TRO. But in those cases, particularly GEMCO, which is cited numerous times both at the Ninth Court level and the District Court level in this case, the issue of the bank's superiority was not even before the First Circuit. Unfortunately for the bank in that case, they had failed to raise that issue at the District Court level. But even if your rights are superior, you can't just take the money when the court has issued a freeze asset order. Well, we think the key is that the funds were never made unavailable. If Philips had kept the TRO going, if it had taken the steps necessary to enforce its judgment and if they had proven to a court of law that they had superior rights, as Judge Gee noted in her motion to reconsider, the funds would have been available for them to enforce on. I think the question that you raised really was when the court said, if the rights are inferior, then they would have violated it. That was our reading of the Philips Three Mandate. And then you were saying by implication, that means if they're superior, they're not. They're not violated. I think it was what you were suggesting. Correct. And that certainly is one way to say somebody would have said if they were, if it were a violation either way, he wouldn't have said it's a violation if you do A. If you met, it's a violation to do A and B. And I think that that is a reasonable implication. It might suggest that the sentence was not written as carefully or with everything in mind, so I wouldn't put too much weight on that sentence. Okay. But I think that's what you were suggesting, if I understood your argument. That was our takeaway from Philips Three. Yeah, that's what you, and it's a reasonable implication. It's not a necessary one. Particularly in light of the fact that the key thing that the Ninth Circuit had been telling the district court for three opinions in six years is conduct an evidentiary hearing and decide once and for all who has superior rights. When you read those two together, we think that's the key issue. If the bank had superior rights, then what it did was fine. And if it didn't have superior rights, then what it did was wrong. But it may also have been just how the parties briefed the case and how it came up from the judge real and not necessarily saying that the converse of that statement is true. Because I was on two of the three cases, and I remember it was very frustrating. But I'm not sure that was the necessary implication of that sentence. Okay. So do you have another argument as to why? Well, I would turn now to another thing that we think the district court got wrong, and that's since my client was a non-party to the underlying lawsuit, there would need to be evidence that my client aided and abetted the contemptuous conduct. And the district court made such a finding, but it was based on three internal bank e-mails that were sent after the TRO had already expired. And they talked about seeking repayment of debt obligations, but there's no evidence that any further payments ever were received from the debtor. And, again, I think the key is that those e-mails happened after the TRO period expired. And they didn't include admissions saying, I'm glad we did the X, Y, and Z two weeks ago. It was talking about strategy of getting repaid on the loan going forward. But we don't think that's a sufficient basis to make a clear and convincing finding of aiding and abetting in this context. I understand. There was a TRO that prevented you from seizing the funds or taking the funds. Is there any question that your client was aware that it was subject to the TRO? No, the bank knew there was a TRO, clearly. The funds that were hidden in an intermediary account in New York, those were frozen because there was no ‑‑ the defendants didn't have an account in the New York branch. The funds that came from other sources that made it to the Singapore branch, they were deposited into the account per the wire instructions, and then the bank debited out of that account and sequestered the funds so they were completely unavailable to the defendants. I don't understand. The bank kept the money. It was all, as I look at it, somewhat of a bookkeeping entry. Yes. The money, it wasn't as if the bank took the money and actually wired it to a fourth party. No, no, absolutely not. You always had it. It was as if the money was in a box. Exactly. And they changed the label on the box. But you never really disposed of it. Correct. Or gave it to anyone else. No. And we took it out of the hands of the defendants that they say were the wrongdoers. And the bank was the one that went to the court for assistance. Didn't you take the money to pay back the debt to the bank? As Judge Corman noted, it was done for internal bookkeeping purposes, and we don't think that makes it unavailable. Well, internal bookkeeping purposes to show that you had taken control of the money for the bank's purposes, for the bank to benefit from it. Well, actually, KDX benefited too because that was helping to repay a loan, the money that they owed to your bank, I mean your client bank. Right? I find it interesting that the New York branch obeyed the freeze asset order and the Singapore branch didn't. I mean, if that theory, if your theory that nothing was ever unavailable is true, the New York branch could have done the same thing. But it didn't have a deposit account. There was no need for KDX to repay a loan to the New York. Well, it was the New York branch under that theory. Branch, right? Is that what it was? I don't think so, Your Honor. I'm not sure I understand the difference between repaying the amount the bank was owed or the bank taking possession of the money for its purposes and saying it's just bookkeeping. The bank clearly applied its right of set-off to those funds that were wired to KBC Singapore. But as the district court found, it had a contractual and equitable right of set-off to that before, during, and after the period. But it shouldn't have done it during the period. I mean, I guess the way I see it is it shouldn't have done that because it was benefiting KDX, possibly at the expense of Phillips. Well, Judge G agreed with you, and she said. I know. We think that finding was in error, but in any event, she found that Phillips certainly hadn't suffered any damages as a result of the bank's superior right. Right, so your client didn't have to pay damages, and that was a good victory for you. With that, I'll save any additional comments for rebuttal unless the Court has more questions. Just so I understand this, which I'm not sure I do, but your assessed attorney's fees, is that right? That's right, Your Honor. So this is about attorney's fees? And the finding of contempt. Obviously, a bank doesn't like that as well. But as far as a monetary result, the monetary result that my client is seeking to overturn is the attorney's fees. Thank you. Just to clarify, she did limit the attorney's fees just to the contempt proceedings? That's correct, Your Honor. Okay. May it please the Court, Sean O'Keefe and Robert Pitts on behalf of U.S. Phillips Corporation. On July 31, 2007, my client obtained an order as to assets that were not in the possession of this bank. That order placed a fence around the totality of the property of the KXD entities. That was its purpose. That order stated the only one who could be paid was my client. That order also forbid any bank or institution from taking any action with respect to those fenced-off assets that would make them unavailable to my client. We took that deed in effect. But you would have gotten that money if you had prevailed, ultimately, on the merits. No, actually, we wouldn't have, Your Honor, because they had already taken the money. That was the problem. Well, that could have been they would have just been ordered to give it to you. I mean, they didn't take it and give it to somebody else. Well, no, Your Honor. They basically, they had the money and they kept it. And as far as I could see, it would have always been available. The fact that they made some bookkeeping entry would not have relieved them of the obligation to pay Phillips if, in fact, Phillips was ultimately entitled to the money. Well, Your Honor, let's take it from an execution perspective. To the extent we get a judgment, we can only execute the account of our account debtor, the judgment debtors. We had no judgment recourse against KBC Bank. I understand, but you had the TRO, and you could have come in and said, well, it wasn't in their account because the KBC made a bookkeeping entry and gave it to themselves, but make them give it back to us. I agree, Your Honor. You agree? I absolutely agree, and that is the reason why we're here. Mechanically, what happened was... There's a question that I want to ask you. I mean, that's one of the things that troubles me about satellite litigation, where there's actually been no damages as a result of what I've characterized, my colleagues may not agree, as a bookkeeping entry. Who gets the money if you win? Your Honor, insofar as the... The counsel fees. I mean, are you going to get it all? In the end, is it going to wind up in your pocket? Yes, Your Honor. So your client is not going to get any of it, and now we're engaged in a kind of satellite litigation. The case is here for the fourth time. And let me tell you what bothers me so you can answer me. This seems to me to encourage, you know, satellite litigation where there's been no injury. It's not as if you collected even a dollar and said, well, we're entitled to counsel fees. You collected nothing. Your client suffers no damages, will not see a penny of this contempt, and it just, the whole scene sort of troubles me. You know, I'm just bothered by it. Well, let me address that. Mechanically, to go back to my original point, when this action was pursued, we had the right to those funds. There was no question about that. We had an absolute right to those funds. That was the reason why we obtained that injunction. At that point, we made them aware of that. We served it on them. Well, but in the end, you weren't entitled to them, to the funds that were allegedly the subject of the contempt. Your Honor. I'm assuming, I know you may disagree with your adversary, but I'm assuming the correctness otherwise of the district court's order. Well, that is where the district court made a clear error of law. But what if she was right? Well, Your Honor, she's only right if we overturn a century of precedent. Well, that remains to be seen. Your Honor, ultimately, this court makes the determination. However, where the district court erred is in a circumstance where you have an equitable right of offset, where you have a contractual right of offset, and where you have a banker's lien. But before you receive possession of the funds, you receive an injunction that says, any distribution, payment, receipt from this universe of people is fenced off. You can't take it. The corollary to that body of case law that gives them recourse says, under those conditions, you can take no greater rights than your transferor. They are restricted funds. So when you take them, you take them subject to the restrictions in that order, which left nothing available for them, because they had been, in effect, fenced off from my client exclusively. That's why we obtained the order. But I think this is the distinction. They didn't have the KDX funds when the injunction issued. But then KDX, while the injunction was in effect, KDX sent them monies to deposit in KDX's own account. Was that right? That is exactly right. So they didn't have it. And then the injunctions in effect, after that, they received the money. So it wasn't just bookkeeping. They didn't have the money. They received the money and, in violation of the asset freeze order, put it in their own account to benefit KDX in its loan repayment. That is exactly right.  In fact, the e-mails weren't just the three. There was a whole stack of e-mails. Those e-mails show they received that injunction. They all sat down and understood that they could not receive money from these people because the KXD entities were enjoined. They were frozen. That's why the transfers made by the KXD entities, when we say unlawful, they were contemnors, serial contemnors. They made those knowing that they were in violation of that injunction. Before the bank received them, we had notified them, these funds are subject to our restriction. They're fenced off for us alone. The bank received that injunction, sat down with a whole group of people, these e-mails show, and said, we are going to take those funds because it's going to accomplish two things. And they sat down with the principal contemnor. Yeah, but I don't understand. I thought that taking of the funds was not the basis for the contempt, that that was rejected by Judge Reel and at the very least affirmed his decision on that was affirmed by the Ninth Circuit in whatever number the decision was. Your Honor, what this Court held in Phillips 1, 2, and 3 is mere receipt was not contempt. That's right. That's all I'm saying. You were saying just the opposite a minute ago. Well, no, Your Honor. I asked you, are you saying they shouldn't have taken the money, and you said yes. Mere receipt, mere receipt under these particular conditions, because that was the ruling, that's the law of the case, we agree. However, from a retention perspective, they received the funds, they then sat down and made a decision internally with Fu Sheng, who owned all of these contemnors, who had a guarantee. And he was one of our defendants. He was the driver with all this infringement. And they sat down together and said we're going to exonerate your guarantee and concurrently get paid in violation of that order, thereby rendering the funds available to us. It is the same thing as if I said I'm going to grab your clerk's what? Run down the street to Wells Fargo, and if you can't catch me, even if you call Wells Fargo and say Mr. O'Keefe is coming with stolen funds to pay off his loan, under the principle of law they're enunciating, if we get that money, it doesn't matter, it's ours, because our lien attaches to it. I don't understand that that's the position. They made the entry, they credited it to themselves, and they would have had to give it up if you had ultimately prevailed. In fact, in the language that was read before, if in fact Phillips' rights are superior and KBC retained the funds as a set-off to KDX's debts while the TRO were in effect, KBC would be in contempt. But the ultimate determination, which I'm assuming is correct for the moment, is that your rights were not superior, and therefore they weren't in contempt. Certainly if you assume that Wells ---- No, I'm willing to say that that's not conclusive, but it just seems to me that if Wells Fargo had my law clerks that you brought to them and I said give them back to me, they would have given them back, and that's what this analogy is. They made an entry crediting their own set-off, and if it turned out that Phillips was entitled, they would have given it. To me, they just didn't dispose of the money. They had disposed of the money, and they owed that amount. They could have given it back even though there wasn't the same money. They had lots of money to give back. Your Honor. It's a question. I mean, it's funny because it's money, and it's all fungible, but it doesn't matter that that particular dollars, those particular dollars they said are now our dollars. Your Honor, see, that was the ruling ---- that was why the Gemco court said you may have priority, but you don't get to take the funds in the teeth of the injunction. That taking was a violation of the injunction. Moreover, the concept that a bank can say I get to violate an injunction because I'm good for the money, when and if you discover that I violated the injunction, it's always okay because I'm a bank and I can pay it back. I would also note that the purpose of this hearing is in part, as this court noted in Phillips 1, is to effectuate the rights that were preserved for us under that TRO. As this court said in Phillips 1, to the extent you had rights under that TRO to protect that fenced-off pot of dollars, we are going to vindicate those rights. They don't evaporate with the expiration of the TRO. Your Honor, in one sense we're talking about, well, money is money. It doesn't matter whether it's the money in one account or money in another. But to come back to the subject of money is money, have you talked about settling this? Your Honor, we have tried to settle. And we have made— What does that mean? Would you be interested in mediation? Your Honor, we had a mediation. It was unsuccessful. The—where Phillips used this, in Phillips's position is— Well, let me ask you. Was the mediation limited to the contempt, or was it limited to every issue that's been raised on this appeal? It was the totality. Well, suppose we disagreed with you on all of those other issues. Would it be feasible on the contempt on this counsel fees, this money, would that—would it be feasible to mediate that? Your Honor, we find that ruling unassailable. It was not simply the application of the contempt. No, no, I'm asking a question. Suppose it came down in our own minds to the only issue, the only real issue that you could prevail on or was arguable was the counsel fees award. Would that be something that would be—that could be mediated? Your Honor, going into a mediation, pursuant to which you're bargaining against yourself, would not put us in a particularly good position. But the answer is I would have to ask my client. I would ask the court, though— On that issue, you're the client. You're both the lawyer and the client. You just said if you want on the contempt, you keep all the money. On the fees, does your client have to pay you? Well, in part, there was a period of time where we were on an hourly basis, and then because of the problems we encountered with Judge Reel, that changed the equation. But I would note this, and I would ask the court, in particular, Judge Corman, do you agree that a bank, a banker's lien attaches to funds when they come in in a restricted environment, as in I hand the bank an injunction? You don't want to get just one vote. You might want to know how we all went about it. I only ask you—right now I'm only talking about the possibility of mediating that narrow claim. And you don't have to talk to your client because you are the client, as you told me in one of the early questions that I asked. So wouldn't it be feasible? I mean, in the grand scheme of things, litigating in federal court over a couple hundred thousand dollars is not necessarily the most efficient use of your talents. Well, Your Honor, the first thing is I've been pursuing this since 2008. I know, and it's not entirely your fault. Well, it's actually—I'll just say this because it is unfair to blame anyone of the attorneys here because the district court judge just kept doing things that were entirely improper. And I think it's very unfair that this litigation was so protracted, and it shouldn't have been. And it's too bad that we continue to have that situation. Well, there is one thing I want to add to that. Counsel's statement to the effect that I'm very glad there was this evidentiary hearing because I wanted that, that is not the case. I demanded and propounded discovery repeatedly to them, and they refused to produce anything. I was only able to obtain discovery when Judge Gee essentially said, you will produce, period, end of story. It was at that point in time that I discovered that they had already taken the funds. They had sat down with a co-contemnor, Fu Sheng, and sought to open new accounts and to engage in a plethora of activities which violated the injunction. It was also—I'm sorry, Your Honor. No, no, go ahead. It was also at that point in time when, first hearing before this court, the bank represented the funds were frozen over and over again until I obtained that discovery. Then magically we see the word sequester. Had the bank told— And that's why that language appears in Phillips 3 because this court assumed it was frozen. That's exactly right because that was the representation of the court. Had the bank come in during that first motion to modify and said, we took the money, we took the money, I have absolute confidence that the judge would say, you violated the injunction. That would have foreshortened all this litigation. Then it would have been a very simple issue, which is the legal issue. Who is entitled to the funds? And in Phillips 1, this court said to me, go back down there, bring a contempt action, and you will be able to get your funds. Now, the only circumstance under which an offset right or a banker's lien attaches is to the extent that the funds are already in the account or in a circumstance where the bank doesn't know that those funds are subject to a restriction. Here, the bank knew. And as Your Honor has pointed out, New York did the right thing. Singapore, because it was their loan, violated the injunction. They had an ax to grind. Let me just suggest this. I think you have a pretty good idea of where we are in general. Let us know in the next week if you and your counsel can settle the financial difference. Just send us a letter if you do. If we don't hear from you in a week, we'll assume that we should go ahead and resolve everything. But I think Judge Corman has just suggested maybe if it's only money, you could solve that because money is money. So if you do tell us, otherwise we'll go ahead and decide the case. Fair word, Your Honor. I appreciate the court's time and consideration. Thank you very much. I have nothing further for Your Honor. Do you object to mediation? I don't know. We'd be happy to talk to him. Well, you can go talk to him. You're both here. You can go out, have a cup of coffee, decide how much you're going to pay him. Thank you, Your Honor. Thank you. The case is argued as under submission.
judges: Reinhardt, Wardlaw, Korman